## S06A0288. SLAKMAN v. THE STATE.
### (632 SE2d 378)

HINES, Justice.

Barry Steven Slakman appeals his conviction, upon retrial, for the malice murder of his wife, Shana Glass Slakman. He was granted an out-of-time appeal following the denial of his motion for new trial, as amended. Slakman challenges the trial court's permitting two jurors from his first trial to testify for the State at his retrial, the trial court's allowing evidence of a probate motion requesting an accounting of the couple's estate, and the effectiveness of trial counsel. Finding the challenges to be without merit, we affirm.[1]

The evidence construed in favor of the verdicts showed that on the morning of July 6, 1993, Shana Glass Slakman was found dead in the apartment that she shared with her husband, Barry Steven Slakman. Approximately five days earlier, she had informed Slakman that she was seeking a divorce. At about 8:45 a.m. on July 6, 1993, Shana's mother, Penny Adamo, arrived at the Slakman apartment to help her daughter move out. Ms. Adamo summoned police when her daughter did not come to the door or answer the telephone.

---

[1] The murder and related crimes occurred on July 6, 1993. On January 21, 1994, a Fulton County grand jury indicted Slakman for the malice murder of his wife; the felony murder of his wife while in the commission of aggravated assault; the aggravated assault of his wife; and the aggravated assault of police officer Lieutenant D.L. Hendrix, who was conducting the murder investigation. The original trial took place April 4-May 4, 1994, and the jury found him guilty on all counts. Slakman was sentenced to life in prison for the malice murder and a concurrent 20 years in prison for the aggravated assault of the police officer; the felony murder stood vacated by operation of law and the aggravated assault of his wife merged with the malice murder for the purpose of sentencing. He filed a motion for new trial on May 19, 1994, and it was denied on April 20, 1999. A notice of appeal was filed on May 17, 1999, and the case was submitted for decision on December 20, 1999. On July 14, 2000, this Court reversed Slakman's conviction for malice murder and remanded the case for a new trial on all charges except the aggravated assault on the officer. *Slakman v. State*, 272 Ga. 662 (533 SE2d 383) (2000). Reconsideration was denied on July 28, 2000.

Slakman was retried before a jury November 6-15, 2001. On November 15, 2001, he was found guilty of all remaining charges. That same day, Slakman was sentenced to life in prison for the malice murder, to be served concurrently with his prior sentence for the aggravated assault of Officer Hendrix; the felony murder stood vacated by operation of law and the aggravated assault was found to merge with the malice murder for the purpose of sentencing. A motion for new trial was filed on November 20, 2001, amended on July 7, 2004, and denied on November 10, 2004. Slakman was granted an out-of-time appeal on January 14, 2005. A notice of appeal was filed on February 14, 2005, and the case was docketed in this Court on October 14, 2005. The appeal was argued orally on February 13, 2006.

A police officer arrived and entered the apartment with Ms. Adamo. Shana was found dead in the bathtub, very blue, face down, and naked, and the water was still running. The television in the master bedroom area was blaring. The front door was dead bolted when police arrived, and they found no indications of forced entry or theft. An autopsy revealed that Shana died between 6:00 and 8:00 that morning from cranial-cerebral trauma complicated by manual strangulation.

At approximately 7:15 that morning, a neighbor observed Slakman put two full garbage bags in the trunk of his car. Slakman was dressed in shorts and a tee shirt and appeared "agitated" and was "looking around." The neighbor had never seen, at that time of the morning, Slakman dressed in the manner that he was rather than wearing a suit.

Later that morning, Slakman went to see a divorce lawyer. Slakman appeared "very nervous," "very shaky, very petrified," and was acting "very aggressive"; his hand was shaking. The way he was acting and the "scared look on his face" made the office receptionist uncomfortable. He was acting differently than other divorce clients that the receptionist had witnessed being upset. That same morning, around 8:15, Slakman had gone to a Merrill Lynch office to ascertain whether his account was solely in his name or held jointly with his wife. He also wanted to deposit a check and sell some stock. Slakman was wearing dark glasses, was shaking, and at one point, started to cry. That afternoon at work, Slakman appeared "pale," "extremely upset," and "visibly shaken"; his body was shaking.

Slakman appeared very nervous and shaky when he arrived at the police precinct later that afternoon. He was given *Miranda* warnings and signed a waiver of rights. Because no one had been ruled out as a suspect, Lieutenant D. L. Hendrix of the Fulton County Police Department deliberately misinformed Slakman that his wife's body had been found in an upstairs bedroom. Slakman was "sweating" and "shaking" and "looked down"; he then "looked up" and said, "you found my wife in the upstairs shower." Hendrix responded that neither he nor another detective had told Slakman that his wife was found in the shower; Slakman disputed what he had been told. Hendrix interrupted Slakman's statements and asked him if he killed his wife. Slakman reacted by physically attacking Hendrix.

In a statement to police, Slakman said that on the morning of the murder, he left for work before 6:00 a.m. and returned home at approximately 7:15 a.m.; he called upstairs to see if Shana was up and heard the television, shower, and washing machine on. Slakman also stated that he had taken out two bags of trash and placed it in his dumpster. However, the police sifted through all the garbage in the

dumpster, and by matching addresses on discarded mail, were able to correlate the bags of garbage to apartments except the Slakman residence.

In 1990, Slakman had run a Dun & Bradstreet report on Shana's father's company, which disclosed that the father was worth millions of dollars. Slakman expressed interest in taking over the running of the father's furniture business. Following Shana's death, Slakman wrote the furniture company, where Shana had been employed, to request information regarding "compensation and benefits she had . . . at the time of her death."

1. The evidence was sufficient to enable a rational trier of fact to find Slakman guilty beyond a reasonable doubt of the crimes charged. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. As already noted, this Court reversed Slakman's conviction for the murder of his wife and remanded that case for a new trial on the murder charges. See *Slakman v. State*, supra. This Court did so after finding that the trial court committed harmful error in allowing the court reporter to testify that she heard Slakman make an admission of guilt to the murder of his wife as he exited the courtroom following Slakman becoming very upset during his cross-examination, and that what she heard Slakman say was "verified" by her in-court audiotape.[2] In the present trial, two jurors from the first trial were allowed to testify about what they heard Slakman say as he was led from the courtroom following his break down on cross-examination in his first trial.[3] Slakman contends that it was error to permit this testimony for several reasons. But the arguments are unavailing.

(a) Slakman argues that the testimony offended the Confrontation Clause, and thus, the trial court was obligated to exclude it, because it seriously compromised his cross-examination in that in order to challenge the jurors' testimony, defense counsel would have been compelled, inter alia, to expose the facts of the first trial and the verdicts rendered. But,

> [t]he right of cross-examination integral to the Sixth Amendment right of confrontation is not an absolute right that mandates unlimited questioning by the defense. . . . The Confrontation Clause guarantees only an opportunity for

---

[2] The court reporter stated that Slakman said, "How could I – why did I do that to her?" The deputy that escorted Slakman from the courtroom testified, outside the jury's presence, that he heard Slakman say, "why did they do that to her?" When cross-examination resumed, Slakman denied making an admission that he had "done that" to Shana, and instead testified that he asked why "they" had done it. *Slakman v. State*, supra at 664 (2).

[3] One juror testified that he heard Slakman say, "Why did I do this to you?" The other juror testified that Slakman stated, "How could I do this?" Or "How could I have done that?"

effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. Accordingly, trial courts retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examination. . . .

(Citations and punctuation omitted.) *Watkins v. State*, 276 Ga. 578, 582 (3) (581 SE2d 23) (2003).

In this case, the trial court did not expressly limit or restrict Slakman in any cross-examination of the juror-witnesses. It was the State that was expressly limited in its questioning of the jurors; the State was prohibited from eliciting any testimony about Slakman's prior convictions. In fact, neither the questioning by the State nor the responses by the witnesses suggested that there was a prior trial on the merits or that the witnesses participated in such trial, much less acted as jurors. The State merely asked the witnesses if they had been present at a "prior hearing," at which Slakman had been shown a photograph of his deceased wife, and if so, what they heard Slakman say.

Insofar as there is any contention that there was an implicit violation of the Confrontation Clause[4] because the defense would have had to reveal the prior trial and convictions in order to have effective cross-examination of the juror-witnesses, it too must fail. The defense could have attempted to expose any potential for bias on the part of the witnesses merely by asking them if, by virtue of their presence at this prior hearing, they had formed any opinion about Slakman's guilt. The choice not to pursue such cross-examination was a strategic decision by trial counsel. Instead, the defense decided to play the audiotape of Slakman's outburst for the jury. Here again, the defense was not "compelled" to do so because it could have cross-examined the witnesses with regard to what they overheard without necessarily revealing the fact of the prior trial or its outcome.

(b) Slakman next argues that the prejudicial effect of the jurors' testimony substantially outweighed its probative value. He urges that as to probative value, at best, it showed that Slakman arguably made a quasi admission of the crime, but that the prejudicial effect was profound because he had to forego cross-examination in order to avoid exposing the prior trial.

But the probative value of the evidence is undeniable. Slakman's statement is clearly relevant and probative of the issues the jury had

---

[4] See, e.g., *Ryan v. Miller*, 303 F3d 231, 247 (II) (2nd Cir. 2002) (testimony that indirectly includes an accusation against the defendant may violate the Confrontation Clause even if the testimony is not a direct reiteration of the accusatory assertion).

to decide. And as has already been discussed, Slakman was not faced with an impossible choice. He did not have to forego cross-examination in order to avoid implicating himself, by virtue of the prior proceeding, for the murder; nor was he required to play the audiotape for the jury. But the fact that he chose to do so mitigates any claim of prejudicial effect because the jury was permitted to hear the outburst for itself, and thereby, determine whether it was an admission of guilt. Moreover, defense counsel requested that the trial court instruct the jury with regard to the audiotape, and also that in that instruction, the trial court inform the jury that what was audiotaped occurred in a prior "trial." Under these circumstances, there was no abuse of the trial court's discretion in finding that the prejudicial effect of the evidence was outweighed by its probative value. *Braley v. State*, 276 Ga. 47, 52 (25) (572 SE2d 583) (2002).

(c) Slakman also urges that the admission of the jurors' testimony violated the "Rule of the Case and basic legal principles, including the doctrines of res judicata and collateral estoppel" in that this Court already determined that the jury was not present when Slakman made the statement. However, allowing the jurors' testimony did not violate the law of the case rule as expressed in OCGA § 9-11-60 (h)[5] or the principles of collateral estoppel and res judicata.

It is true that in a footnote in this Court's prior opinion, it was mentioned that the record indicated that the jury had exited the courtroom before Slakman made his statement. See *Slakman v. State*, supra at 664, n. 4. However, such mention in a footnote does not constitute a "ruling" by this Court so as to be binding in subsequent proceedings in this Court. OCGA § 9-11-60 (h). Nor does the language in the footnote invoke application of the doctrines of res judicata and collateral estoppel. Both require previous litigation and adjudication on the merits. *Waldroup v. Greene County Hosp. Auth.*, 265 Ga. 864, 865 (1), 866 (2) (463 SE2d 5) (1995). And the issue of whether the jury was actually in the courtroom at the time Slakman made his outburst was never litigated, much less adjudicated on the merits, following such litigation.

3. Slakman next contends that the trial court committed reversible error by allowing the prosecution to introduce a probate motion prepared by Slakman which requested, in essence, an accounting of

---

[5] OCGA § 9-11-60 (h) provides:

The law of the case rule is abolished; but generally judgments and orders shall not be set aside or modified without just cause and, in setting aside or otherwise modifying judgments and orders, the court shall consider whether rights have vested thereunder and whether or not innocent parties would be injured thereby; provided, however, that any ruling by the Supreme Court or the Court of Appeals in a case shall be binding in all subsequent proceedings in that case in the lower court and in the Supreme Court or the Court of Appeals as the case may be.

Shana's estate because such evidence was prejudicial and no nexus was established for its admission. However, evidence of a defendant's participation in a probate proceeding, even if it incidentally puts the defendant's character in issue, is admissible if it logically tends to prove a material fact which is at issue at trial and constitutes acts or circumstances which elucidate or shed light upon material issues. *McGinnis v. State*, 258 Ga. 673, 674 (2) (372 SE2d 804) (1988). The probate evidence was admissible as it logically tended to show Slakman's greed and his desire for financial gain from his wife's death.

4. Finally, Slakman contends that his trial counsel was ineffective for failing to object to evidence that he held an accidental death policy in the amount of $243,750, payable to him in the event of his wife's accidental death and to evidence showing that he inquired into his wife's compensation and death benefits available through her employer. But to prevail on the claim of ineffective counsel, Slakman has to demonstrate both that counsel's performance was deficient and that the deficient performance was prejudicial to his defense under the two-prong test set forth in *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). *Pruitt v. State*, 279 Ga. 140, 143 (5) (611 SE2d 47) (2005). In order to meet the first prong of this test, he must overcome the "strong presumption" that the attorney's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. at 144 (5). Moreover, the reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case. Id. As to the second prong, it must be demonstrated that there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of the defendant's trial would have been different. Id. Slakman fails to meet his burden.

At the hearing on the motion for new trial, trial counsel testified that he did not object to admission of the subject evidence because he believed that it was admissible under prevailing law. And indeed it was. There was independent evidence directly relating the existence of the insurance policies and death benefits to Slakman's financial motive for the murder of his wife. *Bagwell v. State*, 270 Ga. 175, 177 (1) (a) (508 SE2d 385) (1998). Slakman obviously knew of the existence of the accidental death insurance policy before the killing because he procured it, and he was quick to lay claim to any monetary benefits to be derived from his wife's death, including those provided by her employer, which was her father's business, the business in which Slakman had expressly hoped to have a financial stake. Financial gain from his marriage to Shana, clearly including her insurance and employment benefits, and the prevention, at all costs,

of the loss of such financial gain by virtue of a divorce provided a compelling motive for the murder. Compare *Stoudemire v. State*, 261 Ga. 49, 50 (3) (401 SE2d 482) (1991), in which there was no evidence of an independent nexus between the charged crime and the existence of the insurance. Consequently, inasmuch as an attempt to exclude the evidence would not have been successful, Slakman's trial counsel cannot be found deficient for not seeking the exclusion. *Bagwell v. State*, supra at 177 (1) (a).

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 26, 2006 —
RECONSIDERATION DENIED JULY 27, 2006.

*Garland, Samuel & Loeb, Donald F. Samuel, William C. Lea*, for appellant.

*Paul L. Howard, Jr., District Attorney, Christopher M. Quinn, Bettieanne C. Hart, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Jason C. Fisher, Assistant Attorney General*, for appellee.